UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| ERIK JOHN STREED, as the Father and Natural Guardian of A.J.S., a Minor; and ERIK JOHN STREED, individually, | Case No. 12-CV-1340 (PJS/JJG) |
| Plaintiffs, | ORDER |
| v. | |
| KEN A. NEUHARTH and SUSANNA M. NEUHARTH, Innkeepers and Owners and Operators of The Country Cove, | |
| Defendants. | |

Ellyn J. Bullock, LAW OFFICE OF ELLYN J. BULLOCK LLC; Alan I. Silver and Steven P. Aggergaard, BASSFORD REMELE, P.A., for plaintiffs.

Anissa M. Mediger and Kathryn R. Downey, MURNANE BRANDT, P.A., for defendants.

Defendants Ken A. Neuharth and Susanna M. Neuharth own a house in southeastern Minnesota, not far from the Mississippi River ("the Property"). The Neuharths regularly rent the Property to vacationers. In December 2010, the family of plaintiff Erik John Streed rented the Property from the Neuharths. During the family's stay, Streed's minor son (A.J.S.) and his cousin (I.L.) engaged in horseplay by rapidly spinning each other in a swivel chair that the Neuharths had placed in an open loft. A.J.S. flew off the chair, crashed through the loft's wooden guardrail, and fell to the floor below. Streed brought this lawsuit against the Neuharths, seeking to hold them liable for the injuries that his son suffered. This matter is before the Court

on the Neuharths' motion for summary judgment.¹  For the reasons set forth below, the Neuharths' motion is granted, and Streed's complaint is dismissed.

I.  BACKGROUND

The Property — a two-story dwelling located in Goodhue County, Minnesota — was constructed over the course of 2004 and 2005.  *See* Morem Dep. 32-33, 52-53 [ECF No. 47-8].  Among its features is a large second-story loft.  *See* ECF Nos. 47-7 & 47-10.  Two sides of the loft are enclosed by walls, and two sides are open to the first story.  *See* ECF No. 47-14.  A guardrail consisting of top and bottom horizontal rails and vertical balusters (that is, spindles connecting the top and bottom rails) extends along the open sides of the loft.  *Id*.

Goodhue County building regulations impose various requirements related to guardrails.  For example, guardrails must be able to withstand live load forces of 200 pounds per square foot.  *See* Morem Dep. 60.  Inspectors test whether a guardrail meets this load-force requirement by "grab[bing] onto the railing . . . and the newel posts and the spindles" and applying force to each of those elements to ensure that they are "rigid, sound, connected, [and] safe."  *Id*. at 55-56.

The guardrail into which A.J.S. collided was formally inspected twice.  First, in May 2005, Goodhue County building official Douglas Morem inspected the guardrail before issuing a Certificate of Occupancy for the Property.  *Id*. at 51-56.  Second, in February 2010, home inspector Lanol Leichty was hired by the Neuharths to inspect the Property.  *See* Leichty Dep. 33-34 [ECF No. 47-9].  Although Leichty does not specifically remember conducting a

---

¹After the hearing on the Neuharths' motion for summary judgment, Streed moved to supplement the record with the transcript of Ken Neuharth's second deposition and an exhibit used during that deposition.  Streed's motion to supplement the record [ECF No. 54] is granted, and the Court has considered these additional documents in deciding whether to grant the Neuharths' motion for summary judgment.

load-pressure test on the guardrail, he testified that it is his routine practice to make certain that the guardrails he inspects meet the applicable load-force requirements, and he did not note any concerns about the Neuharths' guardrail in his report on the Property. *Id*. at 41-46, 61.

The Neuharths purchased the Property in March 2010 with the intent of renting it to vacationers. *See* Ken Neuharth Dep. 7, 13 [ECF No. 47-5]. Shortly after the purchase, the Neuharths began advertising the Property on various websites. *Id*. at 23-26. Joan Streed — Erik's mother and A.J.S.'s grandmother — saw one of those advertisements and inquired about renting the Property over the Christmas holiday. Joan Streed Dep. 9-10, 14 [ECF No. 47-1]. She and her husband toured the Property in October 2010 and, following that tour, reserved the Property for December 22 through December 26, 2010. *Id*. at 12, 18-21.

Twenty members of the extended Streed family stayed at the Property during that time, including Erik Streed and A.J.S. *Id*. at 14. On the evening of December 22, A.J.S. and I.L. took turns spinning each other on a swivel chair that had been placed in the loft by the Neuharths. *See* A.J.S. Dep. 12 [ECF No. 47-15]. At some point while I.L. was being spun by A.J.S., I.L. flew out of the chair and crashed into the guardrail. *See* I.L. Dep. 11-12 [ECF No. 47-4]. I.L. later testified that, as he hit the guardrail, he "might have heard it move." *Id*. at 13.

I.L. then spun A.J.S. on the chair. As I.L. had before him, A.J.S. flew out of the chair and crashed into the guardrail. *Id*. at 14. This time, however, the guardrail did not hold. A number of the balusters gave way, and A.J.S. fell through the guardrail to the floor below. A.J.S. suffered serious injuries, including a broken arm, a concussion, broken teeth, and a collapsed or punctured lung. *See* Erik Streed Dep. 96-97 [ECF No. 47-2]. Streed later brought this action

against the Neuharths, alleging that they had breached their duty of reasonable care to their guests and that this breach proximately caused A.J.S.'s injuries.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id*. at 255.

### B.  Negligence

Under Minnesota law, a plaintiff bringing a claim of negligence must prove "(1) the existence of a duty of care, (2) a breach of that duty, (3) an injury, and (4) the breach of that duty being the proximate cause of the injury."  *Louis v. Louis*, 636 N.W.2d 314, 318 (Minn. 2001). As landowners, the Neuharths have the "duty to use reasonable care for the safety of all entrants upon the premises."  *Olmanson v. LeSueur Cnty.*, 693 N.W.2d 876, 880 (Minn. 2005).  That duty to use reasonable care "includes an ongoing duty to inspect and maintain property to ensure entrants on the landowner's land are not exposed to unreasonable risks of harm."  *Id*. at 881. Thus, as relevant to this case, the Neuharths' duty of reasonable care includes the duty to install and maintain a reasonably safe guardrail in the loft, as well as the duty to periodically inspect the guardrail for defects.

In moving for summary judgment, the Neuharths argue that, based on the evidence in the record, a reasonable jury could not find that they breached any duty to A.J.S. The Court agrees, and finds that Streed's arguments to the contrary are unavailing.

*First*, Streed argues that the Neuharths did not adequately fulfill their duty to inspect the guardrail because Morem and Leichty inspected the Property to ensure compliance with the county's *residential* building code. According to Streed, because the Neuharths regularly rented the Property to vacationers, Morem and Leichty should have inspected the Property to ensure compliance with the county's *commercial* building code (which applies to hotels and inns). *See* ECF No. 46 at 19-23.

The problem with Streed's argument is that, even assuming that the Property should have been inspected under the commercial building code, there is no evidence that the guardrail requirements in the commercial code differ in any material respect from the guardrail requirements in the residential code. To the contrary, Morem testified — and Streed cites no evidence in opposition — that the commercial building code "follow[s] the same 200-pound force" requirement as the residential building code, Morem Dep. 73, and that inspectors perform the same load-bearing test under both codes.[2] In other words, the standards that Streed argues should have been applied to the guardrail *were* applied to the guardrail — and inspectors twice found that the guardrail satisfied those standards.

---

[2]The only difference between the two building codes mentioned in the record is that "there is a different height requirement" for guardrails under the commercial building code. Morem Dep. 73. That difference has no bearing on this case, however, as Streed does not contend that A.J.S. was injured because the guardrail was too short.

*Second*, Streed argues that the construction of the guardrail was inherently unsafe. In support of that argument, Streed notes that Morem testified that the "industry standard" for balusters "is that they are nailed or screwed and glued into place." Morem Dep. 70. The balusters in the Neuharths' guardrail were not affixed with nails, screws, or glue, but instead were locked into place by being inserted into grooves carved in the guardrail's top and bottom rails. *See* Jack Streed Dep. 49 [ECF No. 47-3].

Here, Streed's problem is that, although Morem did indeed testify that use of nails, screws, or glue is the industry standard, he also testified that a guardrail constructed with a groove system "would be just as strong correctly put together without glue or nails per spindle." Morem Dep. 72. In other words, the very witness on whose "industry standard" testimony Streed relies also testified that the groove system used in constructing the Neuharths' guardrail was as safe as that industry standard — as long as the guardrail was "correctly put together."

*Third*, Streed argues that a jury could find that the guardrail was not "correctly put together" because some of the balusters were loose. But all of the evidence on which Streed relies is evidence of the condition of the guardrail *after* I.L. and A.J.S. crashed into it; there is no evidence that anyone — not the inspectors, not the Neuharths, not any prior guest of the Neuharths, and not any member of the extended Streed family — detected any looseness in the guardrail *before* the boys flew into it. For example, two members of the Streed family testified that, after A.J.S. crashed through the guardrail, some of the balusters that remained in the guardrail (relatively far from the spot where A.J.S. went through the guardrail) were loose. *See* Erik Streed Dep. 142; Jack Streed Dep. 50. Likewise, photographs of the guardrail taken after A.J.S. crashed through it show that several balusters were knocked loose from their grooves. *See*

ECF No. 47-14.  Streed claims that the fact that the balusters were loose after the accident proves that they must have been loose before the accident.

But even the Streed's own expert witness testified that he could not tell whether the balusters were loose before the accident from the fact that they were loose after the accident.  *See* Peterson Dep. 114 [ECF No. 44-3 at 20].  Obviously, the balusters could have been secure before the accident, but then knocked loose when I.L. or A.J.S. went flying into the guardrail.  Streed himself testified that he believed the guardrail's top rail pulled away from the balusters during A.J.S.'s collision.  *See* Erik Streed Dep. 141.  It is thus entirely unsurprising that, if the force of A.J.S. crashing through the guardrail caused the top rail to pull apart from the structure, many balusters would have become loose, including balusters that A.J.S. never touched.

*Fourth*, Streed cites the testimony of I.L., who said that after his collision with the guardrail, he "might have heard" the guardrail move.  I.L. Dep. 13.  This is indeed evidence that the balusters "might" have been loose before *A.J.S.* crashed into them.  But this is not evidence that would permit a jury to find that the balusters were loose before *I.L.* crashed into them.  Obviously, the reason why the guardrail "might" have moved when I.L. collided with it is because *I.L. collided with it*, and just as obviously the Neuharths cannot be charged with knowing that the guardrail may have been rendered unsafe by I.L.'s collision with it.  (The Neuharths, unlike the parents of I.L. and A.J.S., were not on the premises listening to the boys roughhousing in the loft.)  A reasonable jury could not return a verdict against the Neuharths based solely on the testimony of I.L. that he "might" have heard the guardrail move when he flew into it.

*Finally*, perhaps recognizing that he has virtually no evidence that the Neuharths acted unreasonably with respect to the guardrail, Streed shifts focus and argues that the Neuharths acted unreasonably by putting a swivel chair in the loft. The Court agrees with Streed that a jury could find that the Neuharths should have known that children would be present at the Property, that children like to spin in swivel chairs, and that children sometimes fall out of spinning swivel chairs. Likewise, the Neuharths should have anticipated that children might roughhouse in the loft and crash against the guardrail, that children or adults might trip and fall against the guardrail, and that a chair or other piece of furniture might be knocked against the guardrail.

But to find the Neuharths negligent, the jury would have to know something about the forces created by these foreseeable events, and the jury would have to know whether the guardrail was constructed to withstand those forces. The record contains no such evidence, except evidence that Goodhue County imposed — and the guardrail met — a requirement that the guardrail withstand live load forces of 200 pounds per square foot. As noted, this 200-pound load-force requirement is imposed under both the residential and commercial building codes, and presumably those who drafted the codes were aware of the types of forces that a guardrail could reasonably be expected to sustain.

In sum, the undisputed evidence in the record as to the condition of the guardrail before I.L. and A.J.S. crashed into it is as follows: The guardrail (including the balusters) was inspected twice by professionals (with one such inspection occurring only 10 months prior to the accident) and found to comply with the 200-pound load-force requirement imposed under both the residential and commercial building codes. Ken Neuharth periodically checked the guardrail for defects in the months leading up to the accident and "never felt any looseness." *See* Ken

Neuharth Dep. 23.  According to a Goodhue County building official, a guardrail with balusters affixed via grooves, when properly installed, is as safe as industry-standard guardrails using nails, screws, or glue.  *See* Morem Dep. 72.  Joan and Jack Streed toured the Property two months before the accident and observed nothing wrong with the guardrail.  Joan Streed Dep. 19; Jack Streed Dep. 11.  And other members of the Streed family observed nothing wrong with the guardrail when they arrived at the Property on the date of the accident.  *See* Stephen Streed Dep. 31-32 [ECF No. 47-11].

Conversely, all of the evidence cited by Streed regarding the guardrail is evidence of its condition *after* I.L. or A.J.S. crashed into it.  Streed's own expert witness testified that evidence of the guardrail's post-accident condition did not make it possible for him to express an opinion about the guardrail's pre-accident condition.  If Streed's own expert could not find, based on the evidence in the record, that the Neuharths acted negligently, then neither can a reasonable jury.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Plaintiff Erik John Streed's motion to supplement the record [ECF No. 54] is GRANTED.

2. Defendants' motion for summary judgment [ECF No. 41] is GRANTED.

3. Plaintiff's complaint [ECF No. 1] is DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: January 21, 2014                s/Patrick J. Schiltz
                                       Patrick J. Schiltz
                                       United States District Judge